Our next case, 23-54 Spotswood v. Kijakazi Mr. Gore. Thank you. Please, and you've reserved three minutes for rebuttals. I have, Your Honor. You may proceed when you're ready. Thank you. May it please the Court. The case before the Court is a disability case, social security disability case. The appellant is unable to work consistently. I'm sorry, I didn't. I'm sorry, am I not? No, I'm getting old. You and me. It's just me. The conditions that the claimant has does not allow her to work consistently. Certainly the diabetes, the neuropathy doesn't allow her to stand. The kidney problems, the renal insufficiency creates anemia, the gastroparosis, all of those conditions got worse. The alleged onset date is January 1, 2019, and that's critical because in this case, the government has no assessment during the period. And the judge very specifically in two or three spots, and I can give it to you, but I'm sure you've seen it, in the decision says everything is worse than when the consultant and the non-examiner saw her. And so consequently, I don't accept that. But without that, there's nothing. What there is is the opinions of the plaintiff, of the appellant's treating sources. Isn't there also self-reporting by Ms. Spotswood? Self-reporting, but the self-reporting that is set forth is very deceptive. For example, it says she walks every day and tries to be active. Well, tries to be active is not being active. And walking every day, and I don't want to walk away from the mic, but that doesn't exactly support standing for six hours or four hours out of the eight-hour day. I can walk to there. Wonderful. And the other thing was that she moved. Well, she didn't. Number one, she didn't. She said, I would like to move to be on my own because now I think it was her niece, and forgive me if it was a different relative. I'd like to, but she didn't. And even if she did, I mean, think of all the people who downsize. Older people or people with disabilities, they move, they don't touch a thing. They get somebody to do it for them. So the factors that the judge noted, they just don't exist, number one. That's another problem because even the non-examiner and the judge, they just, a simple misstatement of fact, there's so many misstatements of fact. For example, in Dr. Genori, which number one was done before the relevant period, in terms of being on your feet standing and walking, he said she couldn't walk heel to toe without difficulty. And the non-examiner, in determining how much claim could work, said, Dr. Genori said that the claimant could stand and walk without any difficulty. A huge difference. I can reach without difficulty. I have trouble reaching. It's just an enormous difference. And both the non-examiner, who didn't look at anything else other than Dr. Genori, the consultant to this opinion, and the judge said, well, surely she can stand and walk because she was standing and walking without any difficulty. Number one, eight months before the AOD, and as the judge said, a lot of worsening since then. But number two, it's just not even what Dr. Genori said. Our claim is that the only two opinions. I'm sorry, can I go? Yes. I want to ask a little bit more about her self-reporting. You addressed some of it, but is it right that she also indicated she performed housework and shopped for groceries? And that's typical. Well, number one, that was done in the initial application, and at that time, she was better. And that she, in response to difficulty standing and walking, she said sometimes not much. Exactly, and that's our whole point. Well, sometimes she does, and sometimes there's all sorts of claims, all sorts of evidence that she gets nauseous after she eats. She throws up. She has to be in the bathroom. When sugars are high or low, you know, you're not able to do things. I'm missing some stuff because I'm doing it fast, but the anemia, which is that she can't, you know, she can't, she's tired all the time. Yes, that's our whole point. Yes, there are portions during the day that she can do these things without question. The question is what, during the period of time that she can't. When she's throwing up in the bathroom, she's not doing anything, even though otherwise, at other occasions, maybe I can shop. And I'm sure she can, but that's just not the point. The point is eight hours a day, five days a week, if you're off task more than, you know, and in this case, we only got to the prior work. But every case before here, you know, 10%, some VEs say 15, some say five. You can't work. That's 90% of the day you can. I can shop 50%, you know, and one day of absence per month. If you're gone, every vocational expert says there are zero jobs remaining if you can't work consistently. And in terms of the four hours a day, there's just no opinion whatsoever on that. Our doctor said one hour. The law is that it doesn't have to match up exactly with a medical opinion. It doesn't have to match up exactly with a medical opinion, but you don't have any medical opinion from the time period that the claimant claimed to be disabled, and the judge himself indicated her condition got way worse. Right, and so you had, I think, six hours in the earlier medical examination, so it seems like the administrative judge is taking into account that it got worse by coming to a conclusion of four hours now. Just totally arbitrary. There's no opinion that, you know, if you have one that's six and one that's two, you have no opinion whatsoever from the period after January 1 of 2009. But the opinions you are relying on, counsel, the opinions you are relying on, when I first saw the idea that there were checkbox questionnaire opinions here, I was expecting to see the sort of questionnaire checkbox forms that I saw 500 times reviewing these cases before, which would say my client is disabled in this way. Here's a brief explanation. For these two providers, the first one actually says defer to PCP on most things, Ms. LeVere. The second one, Nurse Romeo, does have the checkboxes, but the form, maybe it's the form's fault, doesn't give them an opportunity to give any supporting basis for that. So I understand your case law about, you know, checkboxes are okay, we don't just exclude them. That's true. But these are sort of extraordinarily scant questionnaire forms. And if these are the only two opinions on which you're relying, aren't we sort of stuck in that well-established law that says the question for us on review is not whether the plaintiff's position could be sustained, but whether the ALJs can be sustained. And it can't because there's no opinion and the forms, as you mentioned, as Mr. Colgan says, you don't look at the form itself, you look at the underlying records. They all show all these conditions, anemia, kidney function, the diabetes, the gastroparesis, she's on the toilet, she's nauseating, she's throwing up. They all show that the opinions are substantiated that she could not work eight hours a day, five days a week, without missing some time. And it's that time that has to be assessed. And what should occur is that when it goes back, it should be sent either for another consultative or, even better, a medical expert because that doctor then looks at everything. All right. Thank you, Your Honor. Thank you, Your Honor. We will hear via Zoom. Counsel, can you hear us, see us? I can, Your Honor. Can you hear me? Yes. You may proceed. Thank you, Your Honors. Good morning. Good morning. May it please the Court, Molly Carter for the Acting Commissioner. The period relevant in this case is quite short. It begins with the alleged onset date in January of 2019 and it ends with the ALJ's decision in December of 2019. And just before this period, Ms. Spotswood was performing work at the medium exertional level, as the vocation expert testified at pages 52 and 56. And as they acknowledged, Ms. Spotswood did experience brief exacerbations in several impairments in late 2018 and early 2019. But she quickly improved throughout 2019 and none of those exacerbations lasted anywhere near the 12 consecutive months required to show disability under the Social Security Act. Nevertheless, the ALJ did account for some worsening in Ms. Spotswood's impairments by saying that she could do a reduced range of light work in 2019 as opposed to the medium work she was doing in 2018. First, substantial evidence does support the finding that during the period at issue, Ms. Spotswood could stand or walk for a total of four hours in an eight-hour workday. Dr. Putra had found that Ms. Spotswood could stand or walk for up to six hours per day, citing examination findings including normal gait and stance and full sensation and strength, which Dr. Jannori had observed. And again, the ALJ acknowledged that Ms. Spotswood subsequently experienced some exacerbation in her impairments. But as the ALJ explained at page 21, throughout 2019, Ms. Spotswood's gait and strength continued to be normal, even when she once showed diminished sensation, and otherwise her sensation remained normal as well. Citations include 440, 448, 454, 500, and 505. So those same findings that Dr. Putra had cited as supporting standing and walking for six hours per day actually continued throughout the relevant period and certainly support the finding that she could stand or walk for that reduced amount of four hours per day. Ms. Spotswood's testimony did not significantly undermine this evidence. She stated, as your honors pointed out, that her conditions limited her ability to stand or walk, quote, sometimes, but not much. That's at page 43. She also testified that she got up and walked around a lot, and that's at page 47. So all of this evidence supports the finding that Ms. Spotswood could stand or walk for up to four hours in an eight-hour workday. Second, substantial evidence also supports the finding that Ms. Spotswood could sustain full-time work. Ms. Spotswood did not allege to the agency that her impairments would take her off task. In fact, when she applied for benefits, she stated that she had no problems paying attention. She could finish what she started. That's at page 23 of the record. The treatment notes do not establish significant consistent difficulties with attention or attendance. Although Ms. Spotswood experiences anemia, she actually worked through the worst of those symptoms in 2018. She testified that her symptoms improved a lot when she began receiving Procrit injections, which she began receiving at the very beginning of 2019 in February. She reported improvement and or feeling better to her providers three months thereafter. That's at pages 562 to 569. She testified to the ALJ that Procrit helped her fatigue and her energy a lot. That's at page 39. The ALJ also acknowledged, again at page 21, that Ms. Spotswood experienced hypoglycemia beginning in late 2018. She then treated with increased blood testing, insulin adjustments, diet, and exercise. The ALJ specifically explained that by July of 2019, Ms. Spotswood was no longer experiencing frequent hypoglycemia. That's at page 441. She stated at that time that she was very pleased with her sugar readings. That's at page 443. The ALJ also acknowledged that Ms. Spotswood experienced gastroparesis, which she eventually treated by eating multiple smaller meals throughout the day as opposed to three larger meals. What is gastroparesis? Gastroparesis is a gastrointestinal impairment. It affects the stomach into the intestines. Ms. Spotswood in 2018 and early 2019 reported that this resulted for her in intermittent vomiting after she ate, but it was treated, as noted, by eating multiple smaller meals as opposed to three larger meals throughout the day. Since May of 2019, Ms. Spotswood then denied experiencing nausea or abdominal pain outside of a discrete bout of colitis, which is a different lower intestinal impairment. So, for example, at pages 519, 524, 528, she is denying nausea and abdominal pain. So nothing in this record suggests that Ms. Spotswood would have been consistently off task or absent to a disabling degree for 12 consecutive months. Let me ask you this. How much weight should we give to the examination of Dr. Pucci? Well, the question, Your Honor, isn't how much weight the court should give. The question is whether, as the ALJ found, Dr. Pucci's assessment is among the evidence, but not the sole evidence supporting the finding that Ms. Spotswood could stand or walk for up to four hours. So the ALJ found that this assessment was partially, somewhat persuasive. I believe it was somewhat persuasive at page 20. The ALJ noted that Dr. Pucci's exam was, excuse me, it was actually page 22, I apologize, page 22. The ALJ noted that Dr. Pucci had cited to support his opinion Dr. Genori's findings, which again included normal gait and stance, normal movements getting on and off the exam table, rising from a chair, intact sensation and full strength. The ALJ then again acknowledged that there was subsequent evidence that did show greater limitations than Dr. Pucci had acknowledged. And so the ALJ reduced the standing and walking limitations assessed in the RFC from six hours down to four hours. And as explained, the findings that Dr. Pucci himself had cited to support the ability to stand and walk, the normal gait, normal sensation, full strength, all of those continued throughout the record. So just help me understand the procedure. I didn't fully understand it. So the ALJ is entitled to give consideration or weight to the opinion of a doctor who's never examined the patient? Absolutely, Your Honor. The Commissioner's newer regulations apply in this case, the regulations that were adopted in 2017. And under those regulations, the most important factors for the ALJ to consider in evaluating the persuasiveness of a medical opinion or prior administrative medical finding are supportability and consistency. And those are the two factors that, as I just recited, the ALJ did fully consider supportability. You can pass those hurdles even with respect to, you can supply information that assists in clearing those hurdles, even with respect to someone who's never actually been examined. Absolutely, Your Honor. And as the ALJ explained here, that evidence was consistent with what Ms. Spotswood's own providers observed. So those examinations, the examinations that continued into 2019 that showed continued normal gait, strength, and largely normal sensation at pages 440, 448, 454, 500, and 505, those all came from providers who examined Ms. Spotswood. Counsel, what's the response with respect to, I think, the identification of an error in Dr. Puccia's summarizing of Dr. Gennori's findings about walking or not walking in heel? Yes, Your Honor. So it's true. Dr. Gennori had said at page 428 that Ms. Spotswood would walk on her heels and toes with difficulty. And Dr. Puccia erroneously translated that to state without difficulty. However, that is for two reasons, not a reason to remand this case or to question either of the opinions. For starters, RFC is the most that an individual can do. So the fact that she was able to still walk on her heels and toes, albeit with difficulty, would still support exactly what was, that she could do that function. Moreover, this is far from the only finding that either Dr. Gennori observed, that Dr. Puccia cited, or that the ALJ cited. Again, there was walking not on the heels or the toes, a normal, sometimes referred to as a tandem gait, was normal. Stance was normal. She didn't need an assistive device. Full strength, full sensation, everything else was quite normal. Just to remind me, what was the last job that Ms. Spotswood held? She held two assembly jobs, Your Honor, in 2018. I know, but assembling what? I believe she reported that she was assembling water bottles at one position. And I believe that was the position that the ALJ and the vocational expert testified that she could return to. The vocational expert's testimony of the past relevant work is at pages 52 and 56, I believe. Okay. Thank you, counsel. Thank you, Your Honor. Thank you, ma'am. Mr. Gordon, you have three minutes for rebuttal. Thank you. And Judge Parker, just on the issue of the non-examiner, it's not that they never can get weight. We're certainly not taking that position. It's that in this case, the non-examiner looked at one record, Dr. Gennori, nothing else, certainly nothing after 2018, where the disability is claimed to start in January of 2019, and then even misstated the one that he did look at, which is Dr. Gennori. So under the circumstances of those three factors combined, we certainly don't think it should be given any weight. And similarly with Dr. Gennori, because Dr. Gennori, again, said different than the judge understood Dr. Gennori to say it. Dr. Gennori didn't consider, oh my goodness, did not consider in his opinion, did not consider the renal insufficiency, the gastroparosis, the anemia. He didn't even consider those things. So his also should get no weight. We've got no opinions which should be given any weight by the judge in this case, given those circumstances, and even though the form may not have been perfect, still we have two doctors who say that due to the pain, due to nausea, counsel indicated that claimant said that she could pay attention. Without question, but the vocational expert said off task is any time you're not doing it. So if you're running to the bathroom to be nauseous, you might be thinking very clearly, but you're still off task. And so they're just not even in the same universe. Any time you're doing anything. And the judge says it's zero time. Zero, zero, zero, zero, zero time. So we've had vocational experts who've testified up to 5% off task. This has to be submitted so that A, we can get a good opinion, either hopefully from a medical examiner, but if not, at least from a consultative or a non-examiner. Medical examiner would be best because they look at everything. To make a determination and then let the vocational expert react to specifically what was said. The other thing is, there are, I hope I can find it again, there are certainly increased problems after 2019. There's 11 of November of 19, TR 519, nauseous and dizziness, off task. I'm dizzy, I'm throwing up, I'm off task. She had to go to ER in 9 of 19. In 9 of 19, the report that, again, weak and tired, the anemia, which is partly caused by the renal insufficiency and the non-working of the kidney. 8 of 19, they give her gabapentin to try to help, and it doesn't. And it's set forth that it doesn't. And that it has to be increased. All of the, at 7 of 19, the low blood sugar exercise limited, we set forth that she tries to do exercise, but she can't. She certainly can't eight hours a day, five days a week. Worsening numbness in the feet, again, that's after all this. That's why she can't. That's why we need to send it back. Her doctor said one hour. That's why we need to send it back one more time. Thank you, Your Honor. Thank you, counsel. Thank you, counsel. Thank you to you both. The matter is submitted.